MICHAEL OWENS, D/B/A OWENS EXPRESS v. PEPSI COLA BOTTLING COMPANY OF HICKORY, N.C., INC.

No. 440PA89

(Filed 27 January 1992)

1. **Unfair Competition § 1 (NCI3d) — Soft Drink Interbrand Competition Act — state unfair practices laws — preempted**

The federal Soft Drink Act preempts North Carolina's unfair practices laws to the extent that they would proscribe wholesaling restrictions imposed by bottlers to prevent transshipment (selling outside a bottler's territory). The language of the federal act makes it clear that parent soft drink companies may require their bottlers to ensure that their products are not transshipped directly or indirectly, and, in light of Congress's intent to preserve territorial exclusivity, wholesaling restrictions imposed by bottlers to prevent transshipping must be deemed reasonable. The Soft Drink Act preempts North Carolina's unfair practices laws because those laws are decidedly an obstacle to the accomplishment of Con-

---

**OWENS v. PEPSI COLA BOTTLING CO.**

[330 N.C. 666 (1992)]

gress's objectives; however, the Soft Drink Act authorizes bottlers to impose wholesaling restrictions on their customers only to prevent transshipping. N.C.G.S. § 75-1.1(a).

**Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices §§ 461, 468, 735, 788.**

2. **Unfair Competition § 1 (NCI3d) — soft drink pricing — unfair competition — summary judgment**

Plaintiff's forecast of evidence on claims for unfair practices, price fixing, and tortious interference with prospective economic advantage involving soft drink pricing was sufficient to raise a question of fact as to whether defendant's conduct was for the proper purpose of preventing transshipment of its products and therefore protected by the Soft Drink Act; whether defendant intervened with plaintiff's business relationships for a legitimate purpose; and whether plaintiff suffered injury in the form of lost sales.

**Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices §§ 461, 468, 735, 788; Summary Judgment § 23.**

ON discretionary review of a decision by a unanimous panel of the Court of Appeals, 95 N.C. App. 47, 381 S.E.2d 819 (1989), affirming in part and reversing and remanding in part an order of summary judgment entered by *Lamm, J.,* on 25 February 1988, in Superior Court, CALDWELL County. Heard in the Supreme Court 17 May 1990.

*Tuggle Duggins Meschan & Elrod, P.A., by Joseph F. McNulty, Jr., for plaintiff-appellee.*

*Petree Stockton & Robinson, by George L. Little and J. David Mayberry, for defendant-appellant.*

EXUM, Chief Justice.

Plaintiff, a retailer of Pepsi-Cola products, brought this action against defendant, a bottler and distributor of these products, alleging unfair practices and price-fixing under Chapter 75 of our General Statutes, fraud and tortious interference with prospective economic advantage. Defendant pleaded the protections of the Soft Drink Interbrand Competition Act of 1980 (Soft Drink Act), 15 U.S.C. §§ 3501-03.

After an evidentiary hearing, the trial court granted defendant's motion for summary judgment as to all claims. On plaintiff's appeal the Court of Appeals reversed on the Chapter 75 claims and affirmed on the other two. We allowed defendant's petition for discretionary review of the ruling by the Court of Appeals on plaintiff's Chapter 75 claims. Pursuant to Appellate Procedure Rule 15(d), plaintiff brought forward for further review the Court of Appeals' ruling on his interference with prospective economic advantage claim. Plaintiff has abandoned his fraud claim.

Of primary importance in the resolution of this appeal is a question of first impression: whether the Soft Drink Act preempts our unfair practices statutes and related common law principles in governing efforts by soft drink bottlers to restrict the manner in which their customers may resell these products. We hold that it does, but only to the extent that these efforts are for the purpose of insuring compliance with the territorial exclusivity provisions contained in the licensing arrangements common to the soft drink industry. Because the forecast of evidence presented at the hearing on summary judgment raises a question of fact as to whether defendant acted for this purpose, defendant is not entitled to prevail at this stage of the lawsuit.

I.

The forecast of evidence on summary judgment, taken in the light most favorable to plaintiff, the nonmoving party, tends to show the following:

Defendant is the exclusive bottler and distributor of Pepsi-Cola (Pepsi) brand soft drinks in several northwestern North Carolina counties, including Caldwell. As such, defendant is part of PepsiCo, Inc.'s exclusive territorial distribution system. This system functions as follows. PepsiCo produces syrup and concentrate, the flavoring ingredients for its trademarked soft drinks, which it sells to independent bottlers. The bottlers are licensed by PepsiCo to produce and sell finished soft drinks in exclusive geographic territories. Bottlers generally sell their soft drinks to retailers, who in turn sell directly to the consuming public.

To preserve the integrity of the territorial system, PepsiCo forbids its bottlers from "transshipping" — selling outside their territories. Indeed, PepsiCo holds its bottlers accountable for any sale of Pepsi products outside their territories, whether such sales

are made by the bottlers themselves or by their retail customers. Bottlers whose products are transshipped are subject to fines, loss of advertising funds and even cancellation of their franchise agreements. PepsiCo monitors compliance by coding products, tracing them and investigating all reported instances of transshipment.

Plaintiff owns and operates a convenience store in the Caldwell County community of Granite Falls. Operating under the trade name "Owens Express," he offers the usual fare including Pepsi soft drinks, which he purchases from defendant. Plaintiff sells Pepsi products to two types of customers: walk-in customers who purchase in small quantities for individual consumption, and institutional customers—local schools and factories—which purchase in large quantities for resale to ultimate consumers. Plaintiff offers a wide variety of Pepsi products to his walk-in customers, including soft drinks packaged in two-liter plastic bottles ("two-liters") and canned soft drinks in packs of twelve ("twelve-packs"). Plaintiff sells only twelve-packs to his institutional customers. Because defendant also wholesales twelve-packs to schools and factories in Caldwell County, the parties are in direct competition.

By taking full advantage of defendant's seasonal promotional sales, plaintiff is able to undersell both his retail competitors and defendant. During these promotionals, plaintiff purchases discounted soft drinks in quantities sufficient to service his retail and wholesale trades until the next promotional sale. With little storage space in his store, plaintiff stores quantities beyond his immediate needs in warehouses, from which he periodically replenishes his store supply. Thus, plaintiff's prices, both retail and wholesale, are based year-round on defendant's promotional prices. Retail competitors who do not buy in bulk are able to match plaintiff's "everyday low prices" only during promotional periods. During the rest of the year, these competitors must base their prices on defendant's higher "truck price," the fluctuating price at which defendant sells products off its delivery trucks. By the same token, defendant cannot compete with plaintiff's wholesale prices during nonpromotional periods.

Defendant has at times encouraged plaintiff's practice of buying in bulk, as well as his practice of selling to local schools and factories. During its 1986 twelve-pack promotional, defendant offered plaintiff substantial rebates on large purchases and agreed to deliver these purchases to plaintiff's warehouses. In addition,

OWENS v. PEPSI COLA BOTTLING CO.

[330 N.C. 666 (1992)]

one of defendant's local route sales personnel made deliveries directly to plaintiff's institutional customers.

On 2 April 1987, defendant's representatives visited plaintiff's store and demanded that he raise, and maintain, his price for two-liters above defendant's truck price. This was not the first time defendant had attempted to dictate plaintiff's prices for two-liters. In an earlier incident, defendant's representatives responded to complaints from plaintiff's retail competitors by cutting down a banner at his store which advertised two-liters at a low price.

During the 2 April 1987 visit, defendant's agents also forbade plaintiff from wholesaling twelve-packs to local schools and factories, threatening to cut off his supply of Pepsi products if he failed to comply. Plaintiff indicated that he would neither raise his prices nor stop wholesaling.

Shortly thereafter, defendant started its 1987 twelve-pack promotional without offering plaintiff an opportunity to participate. After being contacted by plaintiff's lawyer, defendant informed plaintiff that he would be allowed to participate upon certain conditions. First, plaintiff's store display of twelve-packs would be limited to 100 cases (two twelve-packs to a case), replenished no more than twice a week. Second, he could not store twelve-packs in the back room of the store or in his warehouses. Third, he could sell no more than ten cases per customer. And finally, he could not wholesale twelve-packs. Though plaintiff indicated that he required more than 200 cases a week to service his retail trade alone, defendant refused to increase the prescribed limit.

Plaintiff was permitted to purchase only 2,500 cases of twelve-packs in 1987, 5,000 fewer than in 1986. As a result, he could neither fill orders from local schools and factories nor meet his retail demand. By early fall of 1987, his stock was completely depleted. Though plaintiff had never sold two-liters wholesale, defendant also limited his supply of these products. Plaintiff needed 300 cases of two-liters a week, but was limited to as few as ten.

Defendant also enforced its no-wholesaling command by forbidding at least one of plaintiff's institutional customers from doing business with plaintiff. Defendant threatened to remove the school's vending machines unless it agreed to purchase twelve-packs exclusively from defendant.

OWENS v. PEPSI COLA BOTTLING CO.

[330 N.C. 666 (1992)]

Plaintiff filed his complaint on 10 August 1987, pleading four causes of action: (1) unfair practices under N.C.G.S. § 75-1.1(a), based on defendant's attempts to force him to raise his prices for two-liters, (2) price-fixing under N.C.G.S. § 75-5(b)(3), based on defendant's attempts to prevent him from wholesaling twelve-packs, (3) fraud, and (4) tortious interference with prospective economic advantage. In its answer, defendant admitted curtailing plaintiff's supply of Pepsi products and forbidding him from wholesaling. Defendant explained that it did so to ensure that its products would not be transshipped, and that the restrictions were designed to limit only plaintiff's wholesale trade. Defendant argued that such restrictions are sanctioned by the Soft Drink Act and therefore immune from scrutiny under North Carolina law.

Defendant also admitted that one of its route sales personnel, eager for extra commissions, encouraged plaintiff to wholesale. Defendant asserted, however, that the salesperson acted without the knowledge of management. Defendant denied attempting to force plaintiff to raise his prices for two-liters, or bullying plaintiff's institutional customers.

## II.

[1] We turn first to the issue of whether the Soft Drink Act preempts our unfair practices laws. In its ruling on this issue, the Court of Appeals found the Soft Drink Act "inapplicable" to plaintiff's Chapter 75 claims. The court reasoned as follows:

> Plaintiff's complaint raises allegations concerning tortious contractual interference, fraud, price fixing and unfair and unlawful trade practices arising out of factual allegations that do not pertain to the matters covered by the Act. Therefore, since this Act does not apply, there is no preemption, express or otherwise, of North Carolina authority to apply its laws to the case *sub judice.*

*Owens v. Pepsi Cola Bottling Co.,* 95 N.C. App. 47, 51, 381 S.E.2d 819, 821. Insofar as plaintiff's claims are based on defendant's allegedly improper wholesaling restrictions, the above language amounts to a ruling that wholesaling restrictions, regardless of their purpose, are not protected by the Soft Drink Act. Based on the language of the Act, its legislative history and relevant case law, we are persuaded that it authorizes soft drink bottlers to impose wholesaling restrictions on their customers to prevent transshipping, and

that our unfair practices laws must be deemed preempted to the extent they conflict with that authority.

The Soft Drink Act provides that:

> Nothing contained in any antitrust law shall render unlawful the inclusion and enforcement in any trademark licensing contract or agreement, pursuant to which the licensee engages in the manufacture . . ., distribution, and sale of a trademarked soft drink product, of provisions granting the licensee the sole and exclusive right to manufacture, distribute, and sell such product in a defined geographic area or limiting the licensee, directly or indirectly, to the manufacture, distribution, and sale of such product only for ultimate resale to consumers within a defined geographic area: *Provided*, That such product is in substantial and effective competition with other products of the same general class in the relevant market or markets.

15 U.S.C. § 3501 (1980). Section 3503 of the Act specifies that "the term 'antitrust law' means the Sherman Act, the Clayton Act, and the Federal Trade Commission Act." (Citations omitted.)

This legislation was enacted in response to a 1978 ruling by the Federal Trade Commission that the syrup manufacturers' longstanding territorial distribution system was an unreasonable restraint of trade. S. Rep. No. 645, 96th Cong., 2d Sess. 4-6 (1980). The Act is intended to exempt territorial arrangements from *per se* illegality under the antitrust laws and thereby "preserve the present system of local manufacture, distribution, and sale." *Id.* at 10. In furtherance of this goal, the Soft Drink Act provides for the "enforcement" of license provisions which restrict bottlers, "directly or indirectly," to sale of their product "only for ultimate resale to consumers within a defined geographic area."

The language of the Act makes it clear that licensors — parent soft drink companies — may require their licensees — bottlers — to ensure that their products are not transshipped, whether such transshipment is accomplished directly, by the bottlers themselves, or indirectly, through intermediary resellers. This conclusion is buttressed by the Act's legislative history. According to the Senate Report: "the bill makes lawful license provisions which have the effect of precluding indirect evasions of the license agreement. Thus, the exclusive territorial rights of one licensee are protected from the direct or indirect sales by the licensor or any of its

other licensees into his defined geographic area." S. Rep. No. 645, 96th Cong., 2d Sess. 10. If licensors may require licensees to prevent transshipment as a condition of the licensing agreement, licensees must be empowered to take reasonable steps to comply with such agreement.

The question remains, of course, whether wholesaling restrictions are a reasonable means of preventing transshipping. Plaintiff contends that such restrictions are unreasonable in the situation presented by this case: where the retail customer has engaged in wholesaling but only *within* the bottler's exclusive territory. Defendant responds that it has hundreds of retail customers and cannot afford to speculate as to the market intentions of each one individually. Because some will inevitably transship, a blanket prohibition against wholesaling is the only economically feasible response.

Defendant rejects as unreliable plaintiff's pledge, made in an affidavit opposing summary judgment, to sell only to customers located in defendant's territory and "not to knowingly sell any [soft drinks] to any customer for purposes of resale to an ultimate purchaser located outside [defendant's territory]." As defendant points out, plaintiff has no control over the ultimate disposition of the soft drinks once they are out of his hands. That plaintiff has pledged only to prevent "knowing" transshipment proves this point. Furthermore, it is defendant, not plaintiff, who faces severe economic sanctions for transshipment. Clearly then, bottlers should not be required to rely on their retail customers to prevent transshipping. In light of Congress' intent to preserve territorial exclusivity, wholesaling restrictions imposed by bottlers to prevent transshipping must be deemed reasonable.

Our conclusion that the Soft Drink Act authorizes bottlers to restrict wholesaling in order to prevent transshipping has been approved in every jurisdiction that has considered the issue. *See Commw. of Pa., ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173 (3d Cir. 1988); *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10 (1st Cir. 1985); *Sun Dun, Inc. v. Coca-Cola Co.*, 770 F. Supp. 285 (D. Md. 1991); and *O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217 (N.D. Ill. 1987). In *Zimmerman*, Pennsylvania brought a *parens patriae* action against PepsiCo and two of its bottlers alleging that the three defendants had engaged in the following practices:

using a coding identification system to trace and monitor soft drink sales; fining bottlers when their product is transshipped . . .; refusing to deal with resellers who engage in transshipping; refusing to deal with resellers who buy from or sell to other resellers; threatening termination of resellers who engage in such sales; and limiting sales to resellers to the amount the reseller needs solely for its own retail sales, in order to prevent that reseller from wholesaling.

*Zimmerman*, 836 F.2d at 175. The court upheld the trial court's dismissal under Rule 12(b)(6), Fed. R. Civ. P., of Pennsylvania's antitrust challenge, holding that the alleged practices were "*expressly* permitted by the provisions of section 3501." *Id.* at 183. The court reasoned that

the Soft Drink Act applies to the entire chain of distribution — from the manufacturer all the way through the consumer. It permits the manufacturer to require a bottler to ensure that the ultimate resale of the PepsiCo products it produces will be to consumers within its territory. Thus, it allows bottlers to refuse to sell to resellers whose actions impede this goal.

*Id.* Implicit in the last sentence of the above quote is the assumption that wholesaling by resellers impedes the goal of territorial exclusivity.

Though the Court of Appeals in *Zimmerman* deemed it unnecessary to consider whether wholesaling restrictions were a *reasonable* means of preventing transshipping, the district court considered the issue at length. Citing a case which dealt with the same issue in a different context, *Bruce Drug, Inc. v. Hollister, Inc.*, 688 F.2d 853 (1st Cir. 1982), the court found wholesaling restrictions reasonable, even though presented with a situation in which the resellers did not intend to transship:

It would appear that virtually any box of Hollister (the manufacturer) products sent to Bruce (the retailer) could, potentially, wind up overseas . . . . Defendant cannot be faulted for failing to engage in elaborate and possible [sic] time-consuming speculation about Bruce's marketing intentions on an order-by-order or box-by-box basis.

*Zimmerman*, 658 F. Supp. at 820-21.

## OWENS v. PEPSI COLA BOTTLING CO.

[330 N.C. 666 (1992)]

Based on the foregoing, we are convinced that the Soft Drink Act authorizes wholesaling restrictions by bottlers as a reasonable means of preventing transshipping. We turn, therefore, to the question of whether the Soft Drink Act preempts our unfair practices laws. Having found the Soft Drink Act "inapplicable" to claims challenging wholesaling restrictions, the Court of Appeals necessarily answered this question in the negative. We believe the Court of Appeals erred in its holding.

Contrary to plaintiff's contention, the preemption question is not answered simply by observing that the Soft Drink Act, on its face, only protects against federal antitrust liability. Preemption may be express or implied. *Fidelity Federal Savings & Loan Assn. v. de la Cuesta*, 458 U.S. 141, 152-53, 73 L. Ed. 2d 664, 674-75 (1982). As articulated by the Court in *Fidelity*, the Supremacy Clause of the United States Constitution, Article VI, Section 2, requires preemption where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citing *Hines v. Davidowitz*, 312 U.S. 52, 67, 85 L. Ed. 581, 587 (1941)). In such a situation, state law is preempted to the extent that it conflicts with federal law. *Id.*

North Carolina's unfair practices laws are decidedly an obstacle to the accomplishment of Congress' objectives. Absent the protections of the Soft Drink Act, defendant's wholesaling restrictions would be deemed coercive conduct and therefore violative of N.C.G.S. § 75-1.1(a). *See Wilder v. Squires*, 68 N.C. App. 310, 315 S.E.2d 63, *disc. review denied*, 311 N.C. 769, 321 S.E.2d 158 (1984). As shown above, bottlers must be able to forbid wholesaling by retail customers to preserve territorial exclusivity. We hold, therefore, that our unfair practices laws are preempted by the Soft Drink Act to the extent that they would proscribe wholesaling restrictions imposed by bottlers to prevent transshipment.

We emphasize that our holding is limited. The Soft Drink Act authorizes bottlers to impose wholesaling restrictions on their customers *only* to prevent transshipping. Wholesaling restrictions imposed for any other purpose are outside the purview of the Soft Drink Act and therefore subject to the full scrutiny of North Carolina law.[1] Since retail sales, *i.e.* sales to ultimate consumers,

---

1. The protections of the Soft Drink Act apply only when there exists "substantial and effective competition with other products of the same general class in

by bottlers' customers can pose no danger of transhipping, the Soft Drink Act provides no protection to bottlers' conduct designed to affect or restrict only retail sales by their customers.

### III.

We now examine the forecast of evidence in the light most favorable to plaintiff, the nonmoving party, to determine whether his claims — unfair practices, price-fixing and tortious interference with prospective economic advantage — survive summary judgment. We conclude that plaintiff has established the existence of a genuine issue of material fact as to each of his claims. His claims, therefore, survive summary judgment. N.C.G.S. § 1A-1, Rule 56(c) (1990).

### A.

[2] Plaintiff's unfair practices claim brought under N.C.G.S. § 75-1.1(a) alleges that defendant employed coercive business tactics to force him to raise his retail prices for two-liters. His evidentiary forecast shows that on at least two occasions defendant demanded that he raise his retail price for two-liters and threatened to cut off his supply if he did not comply. Plaintiff's evidence further shows that defendant severely limited his supply of two-liters when he refused to raise his prices. The Court of Appeals deemed this evidence sufficient to survive defendant's motion for summary judgment. We agree with the Court of Appeals.

There is no forecast of evidence that plaintiff sold two-liters wholesale. Rather, the forecast shows that plaintiff sold two-liters only to his walk-in customers. If this is true, there would be no danger of two-liter transshipping. The forecast of evidence is thus sufficient to raise a question of fact as to whether defendant imposed the two-liter supply restrictions in order to prevent wholesaling and, therefore, transshipping, or whether defendant's restrictions pertained solely to plaintiff's retail sales. Thus, defendant may not, on summary judgment, escape liability for plaintiff's unfair practices claim by invoking the Soft Drink Act. Defendant may raise the Soft Drink Act as a defense at trial. Whether it will

---

the relevant market or markets." 15 U.S.C. § 3501 (1980). Such competition is presumed to exist, however, unless plaintiff can prove otherwise. H. Rep. No. 1118, 96th Cong., 2d Sess. 18, *reprinted in* 1980 U.S.C.C.A.N. 2373, 2389. Plaintiff has not made such an allegation in this case.

shield defendant from liability will depend on what the fact finder determines the nature and purpose of the restrictions to have been.

Defendant advances two other theories in support of summary judgment. Neither is persuasive. Defendant first argues that plaintiff's claim makes no economic sense. According to defendant, the challenged supply restrictions could not have influenced plaintiff's retail price for two-liters since defendant supplied plaintiff with sufficient quantities to service his retail trade. There are two responses to this argument. First, plaintiff's forecast of evidence shows that, in actuality, defendant did *not* supply sufficient quantities to service his retail trade. Second, as plaintiff points out, defendant accomplished with supply restrictions that which it was not able to accomplish with threats. By preventing plaintiff from buying in bulk during price promotionals, defendant ensured that plaintiff's retail price would remain linked to the higher "truck price."

Defendant's final argument is that plaintiff has not shown a compensable injury and is therefore barred from recovery by N.C.G.S. § 75-16. According to defendant, plaintiff has not produced any evidence that he actually raised his prices for two-liters as a result of the alleged threats and supply restrictions. Plaintiff's forecast of evidence is that, as a result of the supply restrictions, he did not have enough two-liters to satisfy walk-in customer demand. Lost sales, if proven at trial, would constitute a compensable injury.

Plaintiff's forecast of evidence tends to show that defendant used its control over the supply of Pepsi products to pressure him to raise his prices. Coercive conduct and inequitable assertions of power in a business context are prohibited by Chapter 75 of our General Statutes. *See Wilder v. Squires*, 68 N.C. App. 310, 315 S.E.2d 63, and *Libby Hill Seafood Restaurants, Inc. v. Owens*, 62 N.C. App. 695, 303 S.E.2d 565, *disc. review denied*, 309 N.C. 321, 307 S.E.2d 164 (1983).

Thus, plaintiff's forecast of evidence on his claim under N.C.G.S. § 75-1.1(a) is sufficient to raise a question of fact as to whether defendant's conduct was for the proper purpose of preventing transshipment of the two-liters and protected by the Soft Drink Act or whether it was for other improper purposes alleged by plaintiff and violative of our unfair practices laws. We affirm, as to this claim, the decision of the Court of Appeals.

OWENS v. PEPSI COLA BOTTLING CO.

[330 N.C. 666 (1992)]

## B.

In his claim under N.C.G.S. § 75-5(b)(3), plaintiff alleges that defendant limited his supply of twelve-packs in an effort to destroy him as a business rival in the wholesale market and thereby fix the price for twelve-packs at the "truck price." Plaintiff's forecast of evidence shows that defendant imposed severe supply restrictions after plaintiff refused to stop wholesaling. Plaintiff's evidence shows further that, as a result of these restrictions, he was no longer able to fill orders from his institutional customers, and that such customers were forced to buy twelve-packs from defendant at the "truck price." The Court of Appeals found plaintiff's forecast of evidence sufficient to survive summary judgment. In reaching this decision, the court relied in part on evidence that defendant attempted to force plaintiff to raise his prices for two-liters. Though we agree that plaintiff's evidence is sufficient to survive summary judgment, we believe the court erred in relying on the evidence relating to two-liters.

N.C.G.S. § 75-5(b)(3) provides as follows:

(b) . . . it is unlawful for any person directly or indirectly to do . . . any of the following acts:

(3) To willfully destroy or injure, or undertake to destroy or injure, the business of any competitor or business rival in this State with the purpose of attempting to fix the price of any goods when the competition is removed.

As defendant points out, the parties were not in competition in the retail market for two-liters. Indeed, defendant only sells two-liters wholesale. Thus, evidence that defendant attempted to force plaintiff to raise the retail price of his two-liters, though applicable to plaintiff's unfair practices claim, has no relevance to his claim under N.C.G.S. § 75-5(b)(3).

Plaintiff's claim under N.C.G.S. § 75-5(b)(3) is based on evidence that defendant prevented him from wholesaling by limiting his supply of twelve-packs. Defendant asserts that these restrictions, because imposed to prevent transshipping, are protected by the Soft Drink Act and therefore not actionable under N.C.G.S. § 75-5(b)(3). Though defendant may raise the Soft Drink Act as a defense at trial, the forecast of evidence raises a question of fact as to whether the restrictions were in fact imposed to prevent transshipping.

## OWENS v. PEPSI COLA BOTTLING CO.

[330 N.C. 666 (1992)]

Defendant's entire course of conduct vis-a-vis plaintiff is such that it should be left to the fact finder at trial to determine the propriety of the twelve-pack wholesaling restrictions. First, though defendant claims that it has a strict policy of dealing only with retailers who do not wholesale, defendant initially encouraged plaintiff's practice of buying in bulk and wholesaling to local schools and factories. Defendant went so far as to deliver Pepsi products directly to plaintiff's warehouses as well as to some of his institutional customers. Second, defendant first requested that plaintiff stop wholesaling only after plaintiff had begun underselling defendant. This request was made by defendant's representatives when they visited plaintiff's store on 2 April 1987. During that visit, defendant's representatives also threatened to cut plaintiff off altogether unless he raised his prices for two-liters. These two actions taken in concert suggest they could have been part of a common, unlawful design. Third, defendant imposed supply restrictions on both twelve-packs and two-liters within three weeks of plaintiff's refusal to raise his prices or stop wholesaling. Again, that defendant imposed supply restrictions on two-liters even though plaintiff had never sold this product wholesale, casts doubt on defendant's entire course of conduct. Fourth, contrary to defendant's supposed "anti-transshipping" policy, the restrictions on twelve-packs were so severe that plaintiff could not continue to service his retail trade. That the means do not match the supposed ends calls into question the ends themselves. Finally, even after imposing supply restrictions on plaintiff, defendant threatened sanctions against one of plaintiff's institutional customers to force that customer to buy twelve-packs exclusively from defendant at the "truck price."

The evidence marshaled above is logically compatible with plaintiff's claim that defendant imposed wholesaling restrictions on twelve-packs, not to prevent transshipping, but rather to drive plaintiff out of the wholesale market and fix the price of twelve-packs at its "truck price." There is also evidence to support defendant's explanation of its conduct. The question is one of fact to be resolved at trial and not as a matter of law.

Plaintiff's forecast of evidence on his claim under N.C.G.S. § 75-5(b)(3) is thus sufficient to raise a question of fact regarding whether defendant's conduct was for the proper purpose of precluding transshipment of its products and protected under the Soft Drink Act or whether it was for the improper purposes which plaintiff has alleged and violative of our unfair practices laws. For the

reason stated, we affirm the ruling of the Court of Appeals on this claim.

## C.

Plaintiff's final claim is that defendant interfered with the business relationship between plaintiff and his institutional customers thereby robbing him of prospective economic advantage. Plaintiff's evidence shows that defendant curtailed his supply of twelve-packs so that he could no longer fill orders from local schools and factories, and that defendant forbade at least one of these customers from continuing to purchase from plaintiff. The Court of Appeals held this evidence insufficient to survive summary judgment. The court based its decision on the fact that plaintiff had not shown disruption of any existing contracts. As the court noted, "[n]otably absent from plaintiff's forecast are statements alleging the existence of contracts with any of the persons with whom plaintiff did business." *Owens*, 95 N.C. App. at 53, 381 S.E.2d at 822.

On this point the court overlooked the principle that an action for tortious interference with prospective economic advantage may be based on conduct which prevents the making of contracts. *See Coleman v. Whisant*, 225 N.C. 494, 35 S.E.2d 647 (1945). We believe plaintiff has presented a sufficient forecast of evidence to survive summary judgment on such a claim.

As stated by the Court in *Coleman*:

> We think the general rule prevails that unlawful interference with the freedom of contract is actionable, whether it consists in maliciously procuring breach of a contract, or in preventing the making of a contract when this is done, not in the legitimate exercise of defendant's own right, but with design to injure the plaintiff, or gaining some advantage at his expense.

*Id.* at 506, 35 S.E.2d at 656. Plaintiff's forecast of evidence shows that he had a valid business relationship with several schools and factories in the Granite Falls area, and that he had a reasonable expectation of continuing to do business with these customers. His evidence also shows that defendant was aware of these relationships and intervened to destroy them. As discussed in section III (B) above, plaintiff's forecast of evidence at least raises a question of fact as to whether defendant intervened for a legitimate purpose. Finally, plaintiff's evidence shows that he suffered injury in the form of lost sales. We believe the forecast of evidence sufficient

to survive summary judgment. We therefore reverse the Court of Appeals on this claim and remand it to the trial court.

Plaintiff's evidentiary forecast raises a question of fact as to whether defendant's wholesaling restrictions were imposed to prevent transshipping. Thus, the Soft Drink Act does not shield defendant from liability at the summary judgment stage, though defendant may raise the Act as a defense to these restrictions at trial. In addition, plaintiff has presented sufficient evidence to survive summary judgment on his unfair practices, price-fixing, and tortious interference with prospective economic advantage claims. We therefore affirm in part and reverse in part the ruling of the Court of Appeals, and remand to the trial court.

Affirmed in part; reversed in part; and remanded.